# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| GALLAGHER INDUSTRIES, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 2018-0106-SG |
| | ) | |
| WILLIAM M. ADDY and JOSEPH E. EASTIN, | ) | |
| | ) | |
| | ) | |
| Defendants. | ) | |

## <u>MEMORANDUM OPINION</u>

Date Submitted: February 20, 2020
Date Decided: May 29, 2020

Jon Abramczyk, John DiTomo, Matthew Clark, and A. Gage Whirley, of MORRIS, NICHOLS, ARSHT & TUNNELL LLP, Wilmington, Delaware, *Attorneys for Plaintiff.*

Peter Walsh, Kevin Shannon, and Callan Jackson, of POTTER ANDERSON & CORROON LLP, Wilmington, Delaware; OF COUNSEL: Tammy Wood and Brent Hockaday, of BELL NUNNALLY & MARTIN LLP, Dallas, Texas, *Attorneys for Defendants.*

GLASSCOCK, Vice Chancellor

This post-trial Memorandum Opinion involves a cash-out merger by a controller of a privately-held company, ISN Software Corporation ("ISN" or the "Company"). The Plaintiff, an LLC involved in private equity, acquired stock in ISN in late December 2012 by exchanging its interest in ranchland. No cash changed hands. The merger followed less than three weeks later.

At the time of the merger, ISN provided the Plaintiff with a check for the merger price of its stock, notice of its appraisal rights, and scant details regarding how the Company had set its value for the merger. The Plaintiff, I find after trial, had ample evidence that the merger was unfair, and its interest undervalued. Nonetheless, it cashed the check tendered for its shares, waiving appraisal, and did not bring a breach of fiduciary duty claim during the statutory tort limitations period. I conclude, based on the trial record and reasonable inferences therefrom, that the Plaintiff made a business decision in 2013 that the litigation game was not worth its candle; it was content with the merger price rather than the uncertainties of an appraisal action, and was unwilling to invest the considerable cost and effort involved in a fiduciary tort action, even with the benefit of the entire fairness standard it would have enjoyed.

Meanwhile, two other stockholders sought appraisal rights. The Plaintiff was well aware of this consolidated case; it underwent rather extensive discovery as a non-party in that action. The results of the appraisal were eye-catching—the merger

1

consideration implied the value of ISN as $138 million. After the appraisal trial, I found the fair value to be $357 million. ISN appealed. The Supreme Court affirmed on October 30, 2017. At that point, according to one of the Plaintiff's principals, the matter of a fiduciary duty suit became "very real." In other words, the Plaintiff knew of fiduciary duty claims as of the time they accrued, when it received notice of the merger. It sat on its rights for five years, based on a business decision that it was not worth pursuing appraisal or tort damages, given the costs and risks involved. Once the efforts of the appraisal plaintiffs removed all doubt of the quantum of damages available, however, the Plaintiff brought this suit, alleging that the incomplete and misleading disclosure it had received from ISN was in violation of fiduciary duties, and seeking a quasi-appraisal recovery.

It is clear that the merger process and price were unfair to the stockholders and that the disclosures were materially inadequate. Such was, or should have been, cognizable by the Plaintiff based upon information it had at the time of the merger. Breach of fiduciary duty is a tort, and suits in equity based on tort are, generally speaking, barred by laches no later than the running of the analogous statute of limitations, three years after the action accrues. The Plaintiff argues that it could not have understood the nature of its claim until the Supreme Court's affirmance of the appraisal decision, and it makes less extreme claims that the limitation period was tolled sufficiently to allow this matter to go forward. After consideration of this

2

matter on a full record, however, I find the Plaintiff's tolling argument unavailing, and that the statute of limitations ran in early 2016. Accordingly, the Plaintiff's claim is barred by laches, and I find for the Defendants. My reasoning is below.

## I. BACKGROUND[1]

This is a post-trial Memorandum Opinion. The trial took place over two days on October 8 and 9, 2019. The parties submitted 286 joint exhibits and lodged two depositions. The following facts were stipulated or proved by a preponderance of evidence at trial.

### A. *The Parties*

Plaintiff Gallagher Industries, LLC ("Gallagher") is a private equity firm with total investments of approximately $25 million.[2] Non-party Charles Gallagher founded Gallagher and still indirectly controls it through family trusts.[3]

Non-Party ISN is a privately held Delaware corporation that provides "a subscription-based online contractor management database called ISNetworld."[4]

---

[1] Citations to Joint Trial Exhibits ("JX") are expressed as JX __, at __. Citations in the form "Tr." refer to the trial transcript. The parties submitted a Joint Statement of Facts ("JSOF") containing both undisputed facts as well as "Additional Record Facts" from each party regarding disputed facts, a format I found useful. Joint Statement of Facts, D.I. 94. To avoid confusion, I cite directly to the JSOF *only* for undisputed facts. Where factual matters are disputed and weighing evidence is required, I cite directly to the record.

[2] JSOF, ¶ 8.

[3] *Id.* ¶ 9. I refer to Gallagher Industries, LLC as "Gallagher," and Charles Gallagher as "Mr. Gallagher" to distinguish them.

[4] *Id.* ¶ 2.

Defendant William "Bill" Addy is the founder and executive chairman of ISN.[5] Formerly ISN's CEO, Addy remains the Company's executive chairman, a member of the ISN board of directors (the "Board"), and ISN's controlling stockholder.[6]

Defendant Joseph E. Eastin is currently CEO and a director of ISN.[7] He formerly served as President.[8]

Non-party Thomas C. Loftus is the President of Gallagher, where he has worked since 1998.[9]

*B. Factual Background*

1. ISN Company History

ISN provides a "contractor management database" that connects contractors and business owners.[10] It generates revenue selling subscriptions to both the contractors and the business owners.[11] It works chiefly in the oil and gas industry, but serves clients all over the world.[12] ISN has more than 500 employees.[13] Its

---

[5] *Id.* ¶ 11.

[6] *Id.*

[7] *Id.* ¶ 12.

[8] *Id.*

[9] *Id.* ¶ 10.

[10] *Id.* ¶ 2.

[11] *Id.*

[12] *Id.*

[13] *Id.* ¶ 3.

Board consists of two directors: Defendants Addy and Eastin, both of whom own substantial stakes in the Company.[14] Addy is a controlling stockholder.[15]

In 2011, ISN had one outside stockholder: Ad-Venture Capital Partners, L.P. ("Ad-Venture"), a company controlled by Defendant Addy's brother, Brian Addy.[16] Extensive litigation experience has demonstrated to me that the relationship between the brothers Bill and Brian Addy is contentious.[17] Ad-Venture owned 900 shares of ISN.[18] Wanting to value its shares for the purpose of a sale to Polaris Venture Partners ("Polaris"), Ad-Venture filed a books and records action under 8 *Del. C.* § 220 (the "220 Action") on June 28, 2011.[19] ISN contested the 220 Action.[20]

On June 30, 2011, just after the 220 Action commenced, ISN received a valuation it had requested from Peter J. Phalon of Waterview Advisors, Inc. (the "Phalon Valuation").[21] The Phalon Valuation created five-year revenue projections for the Company out to 2016, which were based on discussions with Addy.[22] Based

---

[14] *Id.* ¶¶ 3, 11–12.

[15] *See id.* ¶¶ 5, 12.

[16] *Id.* ¶ 4.

[17] *E.g.* Tr. 11:17–24 (Addy) (testifying "it's no secret there was friction between myself and my brother . . . he had sued me for emotional distress. He had sued the company a couple of times.").

[18] JSOF, ¶ 16.

[19] *Id.*

[20] *See id.* ¶¶ 17–18.

[21] *Id.* ¶ 22.

[22] Tr. 92:17–93:14 (Addy).

on these projections, the Phalon Valuation valued ISN as of June 30, 2011, at $127 million.[23]

On October 31, 2011, while the 220 Action was ongoing, the Board met for thirty minutes, and after that meeting, Addy wrote a letter that he distributed to the ISN stockholders (a letter referred to in prior proceedings of this court, and here, as the "Halloween Letter").[24] At the time of the Halloween Letter, Ad-Venture was the only unaffiliated ISN stockholder.[25] In other words, the Halloween Letter was in essence written to Ad-Venture.[26] The Halloween Letter reads, in full:

> Dear Shareholders:
>
> I am writing to advise you of a significant change in strategy for ISN Software Corporation. As you may have seen in our most recent submission of revenue figures to INC Magazine, ISN's growth rate has slowed substantially. In fact, our reported 25% growth rate from 2009 to 2010 is our slowest reported growth rate in the history of the company. It appears that 2011 growth will be roughly the same as 2010. After a number of years of successfully exploiting our niche, we expect slower contractor addition growth rates for the foreseeable future.
>
> In light of this forecast and in an effort to increase long-term shareholder returns, the ISN board of directors has authorized

---

[23] JX 37, at 5.

[24] JSOF, ¶¶ 28–30; JX 39, at 1 (October 31, 2011 Board minutes indicating meeting was conducted from "9 am to 9:30 am"). The parties embraced the Halloween Letter moniker, resulting in much wordplay at trial. *E.g.* Tr. 437:17–20 ("So I like to think of the Halloween letter as trying to spook Ad-Venture, not the data; isn't that right?"), 459:4–8 ("And to the extent Gallagher was spooked by the Halloween letter, could they look at the financials that they were actually sent to put themselves at ease?").

[25] *See* JX 40, at 2.

[26] Tr. 10:22–11:4 (Addy).

management to pursue two new and complimentary strategic thrusts, namely, acquisition of businesses and acquisition of real estate.

Business acquisitions will concentrate on businesses where:
  1) There is potential to sell additional services to our existing customer base, and/or
  2) There is potential to leverage ISN experience in SAAS business practices.

We will solicit business acquisition opportunities and may also invest in private equity funds that have the potential to increase our access to acquisition deal flow.

Real estate acquisitions (including new construction) are expected to fall into two categories:
  1) Operations Support including office buildings, parking lots, data centers and ancillary support facilities.
  2) Business Development Support including hunting ranches, ski homes, beach properties and city central condominiums. Ownership of these types of Business Development Support properties is common among the owner and contractor customers we serve. We expect these properties to be used for customer meetings, entertainment, management retreats, travel accommodation and, subject to company guidelines, employee personal use.

Real estate acquisitions are initially contemplated to be no leverage/low leverage deal structures that can be used as loan collateral in the event funds are needed for business acquisitions. In light of current economic conditions, our expectation is that real estate acquisitions, when eventually liquidated, will achieve attractive returns on investment as well as facilitating near-term support for operations and business development.

We will explore for acquisition opportunities in both the US and abroad. Leading these efforts will immediately become a primary duty for me.

Thank you for your continued support.

Sincerely,

/s/ William M. Addy
Chairman and CEO[27]

The "significant change in strategy" identified in the Halloween Letter was one of three other major topics discussed at the thirty-minute board meeting.[28] From trial testimony, it appears that this "change in strategy" first arose in 2009 and was in fact largely promulgated to help leverage a buyout of Ad-Venture shares.[29] ISN wanted such a buyout in order to prevent those shares from being sold to third parties.[30]

Although the Defendants purported to investigate several of the opportunities outlined in the Halloween Letter, with a single limited exception, it ultimately pursued none.[31] In addition, Addy testified (in a separate action) that he never informed ISN senior management about these "significant change[s] in strategy" for the Company.[32]

As the Defendants themselves testified, the Halloween Letter portrayed declining growth at ISN.[33] While the Company's growth *rates* were declining, it

---

[27] JX 40, at 2–3.

[28] JX 39, at 1–2.

[29] Tr. 416:2–420:20 (Eastin).

[30] *Id.*

[31] *See* JX 39, at 2; JX 257; JX 181; JX 156; Tr. 10:9–11, 17:8–18 (Addy), 355:7–356:3, 442:19–443:14 (Eastin). ISN invested in a private equity fund in January 2012. Tr. 17:6–14 (Addy).

[32] JX 211, at 852:3–6; *see also* Tr. 442:4–445:8 (Eastin).

[33] Tr. 437:9–13 (Eastin).

continued to add the same numbers of new clients, expand its revenues through price increases, improve its margins, and exceed its stretch budget.[34] In other words, business was good; in fact, business was good enough that Addy's and Eastin's compensation more than doubled from 2009 to 2011.[35] 2012 followed on this growth and became what Addy described as ISN's "best year ever."[36]

In April 2012, following the 220 Action, ISN produced certain books and records (the "220 Production").[37] Although ISN possessed the Phalon Valuation during the entirety of the 220 Action, it did not include it in the 220 Production.[38] ISN *did* include the Halloween Letter in the 220 Production.[39]

### 2. Gallagher Obtains ISN Stock

In general, Loftus was responsible for Gallagher's business, and Mr. Gallagher—though he had final authority on decisions—relied on Loftus to conduct the business.[40] A Gallagher affiliate owned four "ranch properties"[41] (the "Ranch

---

[34] Tr. 8:9–22, 58:23–59:8, 63:9–13, 72:14–17 (Addy), 391:5–6, 401:5–403:21, 413:22–414:11, 432:15–438:3 (Eastin); JX 95, at 4; JX 53, at 2; JX 39, at 1; JX 52, at 2.

[35] Tr. 431:13–432:14 (Eastin); JX 155, at 49–50.

[36] Tr. 63:14–17, 76:24–77:10 (Addy).

[37] JSOF, ¶¶ 17–18.

[38] *Id.* ¶¶ 23–24. Addy testified at trial that disclosure was not required under the terms of the agreement reached as a result of the 220 Action. *See* Tr. 48:6–7 (Addy).

[39] JSOF, ¶ 33.

[40] *See* Tr. 140:6–10, 146:2–11 (Loftus), 288:3–22 (Gallagher).

[41] Apparently, these are multi-acre residential lots. *See* Tr. 99:6–13 (Loftus), 277:5–8 (Gallagher).

Properties") it wished to sell.[42]  These Ranch Properties were illiquid assets, and Gallagher's main goal in selling them for the affiliate was to obtain a certain dollar amount to protect the affiliate's interest, rather than achieve the highest price available.[43]  Ad-Venture's controller, Brian Addy, approached Gallagher in 2012 about acquiring the Ranch Properties in exchange for shares of ISN stock.[44]  Loftus negotiated with Brian Addy regarding the exchange.[45]  As a part of the exchange, Gallagher and Ad-Venture entered a "Minimum Proceeds Agreement," which obliged Ad-Venture to pay Gallagher the difference between the value of the ISN shares and $5.2 million if Gallagher disposed of the shares for less than that amount.[46]

During negotiations, Brian Addy told Loftus that he had a valuation of ISN supporting a value for the Company of $425 million.[47]  The two discussed valuations ranging from $275 million to $500 million.[48]  During negotiations, Gallagher received two actual valuations.[49]  The first, prepared by Ad-Venture, valued ISN at

---

[42] JSOF, ¶ 52.

[43] Tr. 140:15–18, 147:7–148:10 (Loftus).

[44] JSOF, ¶ 52.

[45] *Id.* ¶ 53.

[46] JX 87, Ex. D, Minimum Proceeds Agreement.

[47] JSOF, ¶ 54; JX 61.

[48] Tr. 142:12–15 (Loftus).

[49] JSOF, ¶¶ 55–56.

$395 million.[50] The second, prepared by an independent valuation firm, valued ISN at $450 million.[51] Loftus expressed some skepticism of these, given that they were produced by Ad-Venture or at Ad-Venture's direction.[52]

Gallagher did not perform its own official valuation, as there were no company projections.[53] As part of his presentation of the deal to Mr. Gallagher, though, Loftus included a page titled "Valuation," which assigned an equity value to ISN of $285 million.[54] Loftus did not, however, provide Mr. Gallagher with the valuations he had received from Ad-Venture.[55]

To facilitate the transaction, Gallagher (through Ad-Venture) submitted due diligence requests to ISN, and the parties entered a non-disclosure agreement.[56] As a part of due diligence, ISN produced the Halloween Letter, but it did not produce the Phalon Valuation.[57] Then, at Gallagher's request, ISN supplemented its due diligence production with additional documents.[58] ISN did not, however, produce

---

[50] *Id.* ¶ 55; JX 55.

[51] JSOF, ¶ 56; JX 59.

[52] Tr. 155:22–156:14 (Loftus).

[53] *See id.* at 151:16–24 (Loftus).

[54] JX 80, at 5.

[55] Tr. 291:1–23 (Gallagher).

[56] JSOF, ¶¶ 61–63.

[57] *Id.* ¶¶ 64–65.

[58] *Id.* ¶¶ 66–68.

information beyond what it had produced to Ad-Venture in the 220 Action.[59] Loftus described the relationship between Gallagher and ISN as "adversarial."[60]

In November 2012, Loftus and Addy corresponded briefly about the due diligence and the Halloween Letter.[61] Ultimately, Gallagher agreed to exchange the Ranch Properties for 155 ISN shares.[62] The exchange of the Ranch Properties for 155 ISN shares (the "Exchange Transaction") closed on December 20, 2012.[63]

### 3. ISN Conducts a Merger and Makes Disclosures

In January 2013, ISN discussed conducting a cash-out merger (the "Merger") of the shares owned by Polaris and Gallagher under 8 *Del. C.* § 251.[64] The purpose of the Merger was to reduce the total number of shareholders so that ISN could move closer toward converting to an S-Corporation, which would be beneficial for tax purposes.[65] As long as Ad-Venture, Polaris, and Gallagher held shares, ISN would not qualify for S-corporation treatment.[66] However, ISN decided not to cash out all three because of risks associated with that size of Merger, including the possibility

---

[59] Tr. 18:19–21, 19:3-11 (Addy), 100:19–103:7 (Loftus); JX 69, at 4.

[60] Tr. 100:13–101:2 (Loftus).

[61] JX 73, at 1.

[62] JSOF, ¶¶ 87–90.

[63] *Id.* ¶ 91.

[64] *Id.* ¶ 103; JX 92 at 7–10; JX 97.

[65] JSOF, ¶ 121; JX 92, at 6.

[66] JSOF, ¶ 122.

of a negative result in an appraisal proceeding.[67] It was Addy's intent that Ad-Venture, run by his brother, not be cashed-out.[68] Ad-Venture, nonetheless, had statutory appraisal rights under the Merger contemplated.

To prepare for the Merger, ISN retained prominent Delaware counsel ("ISN Delaware Counsel") to advise on Delaware law.[69] ISN Delaware Counsel attended a January 9, 2013 board meeting, where the Board resolved to approve the Merger.[70] The Board did not retain a financial advisor or obtain a fairness opinion in connection with the Merger.[71]

Addy set the Merger consideration at $38,317 per share (the "Merger Consideration"), and Eastin agreed to the amount.[72] This per share price valued the Company at $138 million.[73] To reach this determination, the Board started with the Phalon Valuation from 2011 and made various adjustments by hand on a piece of paper.[74] The Defendants testified they made these adjustments by comparing the Phalon Valuation against the Company's 2012 performance.[75] However, Addy's

---

[67] JX 92, at 5–6.

[68] *See* Tr. 135:18–136:9, 160:16–161:17 (Loftus).

[69] *See* JX 92.

[70] JSOF, ¶¶ 104, 107.

[71] *Id.* ¶¶ 111–12.

[72] *Id.* ¶ 129; Tr. 29:23–30:2 (Addy).

[73] Tr. 116:7–12 (Loftus).

[74] JSOF, ¶ 130; JX 91; Tr. 49:8–22 (Addy).

[75] Tr. 30:3–32:22, 94:8–95:16 (Addy).

adjustments are not compatible with this testimony; they fail to account for the fact that actual revenue in 2011 and 2012, as well as projected revenue in 2013, were all substantially higher than projected in the Phalon Valuation.[76] In fact, the Company's projected revenue for 2013 already exceeded the revenue that the Phalon Valuation projected for the end of its five-year period in 2016.[77] In the notice ISN would send the next week, it provided neither the projections it relied on to calculate the Merger Consideration nor the mismatch between actual performance and these projections.[78]

Following discussions about the Company's desire to move toward S-corporation status at the January 9 board meeting, ISN executed the Merger, with Addy signing on behalf of Sub Inc., Eastin signing on behalf of ISN, and Addy and Eastin providing majority shareholder approval through a written consent.[79]

On January 16, 2013, ISN notified the shareholders of the Merger and their appraisal rights in connection with the Merger (the "Notice").[80] ISN supplemented the Notice with disclosure documents, which included all documents produced during Gallagher's due diligence, as well as 24 pages of additional financial

---

[76] *Compare* JX 37, at 49 (Phalon Valuation) *with* JX 76 (historical revenues for 2011 and 2012 and projected 2013 budget) *and* JX 91 (Addy's adjustments); *see also* Tr. 94:8–95:16 (Addy), 390:8–394:19, 399:1–4 (Eastin); JX 76; JX 101, at 423.

[77] *Compare* JX 76 (2013 budget) *with* JX 37 (Phalon Valuation).

[78] Tr. 51:10–52:4, 89:23–90:5, 95:9–16 (Addy), 369:7–13, 370:8–18, 413:6–17 (Eastin).

[79] JSOF, ¶¶ 108–109; JX 97.

[80] JSOF, ¶ 138; JX 98.

information (the "Supplemental Documentation").[81]  These additional pages provided only minimal forward-looking finances, focusing chiefly on the Company's historical financial information for 2005 through projected 2013.[82]  The Notice identified Gallagher and Polaris as the stockholders eligible for appraisal.[83] The Notice also purported to inform the stockholders how ISN calculated the Merger consideration, thusly:

> In establishing the consideration provided to the holders of the Common Stock in the Merger, the board of directors of the Company considered a variety of factors, including the Supplemental Documentation (as defined below) enclosed with this Notice and the financial condition of the Company as reflected therein.  The board of directors of the Company established such consideration based on those factors and such other considerations as the board in its judgment deemed appropriate.[84]

At trial, Addy testified that to understand how ISN arrived at the Merger Consideration, one would use the Phalon Valuation, his adjustments to it, and the January 9 board meeting minutes.[85]  None of these three items were provided with

---

[81] JSOF, ¶ 140; JX 101.

[82] Tr. 342:14–21, 376:9–377:11 (Eastin); *see also* JX 101, at 429.

[83] JSOF, ¶ 142.

[84] *Id.* ¶ 141; JX 97, at 7.

[85] Tr. 50:2–24 (Addy).  Addy later confirmed this for the purpose of ISN's audit.  JX 162, at 1.

the Supplemental Documentation.[86] The Supplemental Documentation did, however, include the Halloween Letter.[87]

Along with providing the Notice to Gallagher, ISN included a check for $5,939,135, which represented the value of Gallagher's 155 ISN shares at the Merger price.[88] The Notice stated: "upon cashing or negotiating the enclosed check, Gallagher will be treated by the company as having waived any appraisal rights to which it may otherwise be entitled."[89]

### 4. Gallagher Reviews the Notice and Accepts the Merger Consideration

Gallagher received the Notice, Supplemental Documentation, and the check for the Merger on January 17, 2013.[90] After Loftus received the Notice from ISN, he provided it to Gallagher's counsel at Moye White, where two attorneys spent over an hour reviewing the materials, then conducted a call with Loftus.[91] Loftus himself reviewed the Supplemental Documentation provided with the Notice.[92] Based on his review, he conducted informal calculations and came up with a range of $250

---

[86] Tr. 32:6–8, 51:10–18 (Addy), 369:7–13, 370:8–18 (Eastin).

[87] JX 101, at 178–79.

[88] JSOF, ¶ 143.

[89] *Id.*

[90] *Id.* ¶ 222.

[91] Tr. 181:6–14 (Loftus); JX 111, at 2 (time records from Moye White indicating review and phone call with Loftus).

[92] Tr. 118:10–16 (Loftus).

16

million to $350 million for ISN's value.[93] Loftus testified he questioned his analysis because ISN's insiders had determined a lower value, and he presumed they had better information.[94] He also testified, however, that the delta between his rough calculations and ISN's assigned value were sufficiently large to raise "concerns" about the fairness of the ISN valuation.[95] Ultimately, however, he "assumed [Gallagher] could trust the process and the management team," and so he did not contact ISN with questions.[96]

Loftus emailed Mr. Gallagher, attaching the Notice, at 2:20 p.m. that same day, January 17.[97] Final authority to accept the Merger Consideration or seek appraisal sat with Mr. Gallagher.[98] Loftus did not share with Mr. Gallagher his informal calculations based on the ISN financials that roughly valued the Company at $250 million to $350 million.[99] He did share with Mr. Gallagher, however, his

_____

[93] *Id.* at 120:3–121:8, 149:5–153:5, 198:6–199:10, 200:19–201:23 (Loftus).

[94] *Id.* at 149:5–153:5, 198:6–199:10, 200:19–201:23 (Loftus). Loftus testified that the Halloween Letter led him to conclude the lower valuation might be due to the slowing growth and directional changes described in that letter. *Id.* at 108:1–20, 119:10–15, 205:3–19 (Loftus). However, he also observed that the balance sheets did not reflect a change in strategy toward real estate or business acquisitions. *Id.* at 174:12–175:1 (Loftus).

[95] *Id.* at 206:22–207:7 (Loftus).

[96] *Id.* at 202:20–203:2 (Loftus). Part of Loftus's unwillingness to reach out to ISN was based on his previous adversarial encounters with Addy when Gallagher was conducting diligence prior to acquiring the stock. *Id.* at 203:3–15 (Loftus).

[97] JSOF, ¶ 223; JX 102.

[98] JSOF, ¶ 249.

[99] Tr. 201:4–202:7 (Loftus).

confusion about the basis for ISN's valuation, as well as the potential that ISN's growth was slowing, based on the Halloween Letter, with the result that ISN's valuation might overvalue or undervalue the Company.[100]

Mr. Gallagher agreed with Loftus's decision not to inquire further with ISN because, he testified, he believed ISN had a legal duty to give Gallagher fair value for its shares.[101] However, rather than "simply trust defendants," Mr. Gallagher asked Loftus to review the materials provided and give him a "view as to the fairness" and enough information to make a decision.[102] Loftus told Gallagher that ISN's assigned value "might be low," and as a result, Gallagher might be "leaving money on the table" if it accepted the Merger Consideration.[103] After discussing the Halloween Letter, Mr. Gallagher felt that ISN might be experiencing "a very significant decline," including "almost a collapse of their earnings."[104]

The Notice provided Gallagher twenty days to decide whether to accept the Merger Consideration or seek appraisal.[105] In making the decision, Gallagher's "number one goal" was to ensure the Gallagher affiliate whose Ranch Properties had

---

[100] Tr. 196:24–201:23 (Loftus), 300:10-301:20 (Gallagher).

[101] *Id.* at 308:3–309:2 (Gallagher).

[102] *Id.* at 265:9–15 (Loftus), 327:18–22 (Gallagher).

[103] *Id.* at 311:20–312:4 (Gallagher), 269:7–14 (Loftus).

[104] *Id.* at 305:10–306:2 (Gallagher).

[105] JX 98, at 3.

18

been exchanged for the ISN shares was "taken care of."[106] The Merger Consideration was sufficient to achieve that goal.[107] In fact, the $5.9 million cash-out significantly exceeded the $5.2 million called for in the Minimum Proceeds Agreement.[108] Thus, accepting the Merger Consideration satisfied Gallagher's investment goals and avoided a risk-laden and potentially costly appraisal action.[109]

Based on these factors, Mr. Gallagher made the decision on the spot.[110] Late in the afternoon of January 17—the same day it received the Notice, Supplemental Documentation, and Merger Consideration—Gallagher deposited the check.[111] Ad-venture, by contrast, made the decision to seek an appraisal of it stock.[112] Mr. Gallagher testified that at the time he accepted the Merger Consideration, he was aware that Ad-Venture would seek appraisal.[113]

---

[106] Tr. 214:3–215:12 (Loftus).

[107] *Id.* at 214:24–215:3 (Loftus).

[108] *See* JX 87, Ex. D, Minimum Proceeds Agreement.

[109] Tr. 213:5–8, 215:13–216:24 (Loftus).

[110] *Id.* at 321:23–322:9 (Gallagher).

[111] JSOF, ¶ 287; JX 105–106. Mr. Gallagher decided to distribute the Merger consideration to Gallagher's owners *pro rata*. JSOF, ¶ 288.

[112] *See* JSOF, ¶ 292.

[113] Tr. 324:2–7 (Gallagher).

### 5. Ad-Venture and Polaris Seek Appraisal

Following the Merger, both Ad-Venture and Polaris petitioned this Court for appraisal of the fair value of their shares (the "Appraisal Action").[114] During the course of the litigation, ISN maintained that it had paid fair value in the Merger.[115] On September 19, 2013, as a part of the Appraisal Action, ISN subpoenaed Gallagher, seeking both document production and testimony.[116] Gallagher was served with the subpoena on September 23, 2013.[117] Gallagher retained Moye White to assist in responding.[118]

On October 10, 2013, ISN Delaware Counsel emailed Moye White regarding a deposition, and Moye White responded on October 21.[119] Thereafter, Gallagher produced more than 1,800 pages of documents and a privilege log.[120] Moye White again communicated with ISN Delaware Counsel on January 24 and 28, 2014, regarding Gallagher's deposition.[121] The attorneys continued to communicate up until Loftus was deposed as Gallagher's representative on February 10, 2014.[122] At

---

[114] JSOF, ¶ 292.

[115] JX 261, at 7; JX 188, at 73; JX 195, at 3.

[116] JSOF, ¶ 304.

[117] *Id.*

[118] *Id.* ¶ 305.

[119] *Id.* ¶¶ 307–308.

[120] *Id.* ¶ 306.

[121] *Id.* ¶ 309.

[122] *Id.* ¶¶ 310–13.

20

his deposition, Loftus provided testimony regarding, among other things, his rough valuations that calculated ISN's value at around twice the Merger Consideration.[123] He also testified at his deposition that he thought the Merger Consideration was too low.[124]

During the Appraisal Action, Ad-Venture and Polaris moved to compel documents from ISN twice, the first time on October 1, 2013, and the second on March 4, 2014.[125] These motions to compel were resolved by a special discovery master, who publicly filed a report on April 10, 2014.[126] Loftus testified that he did not know about the motions to compel until his deposition because he was not "monitoring th[e] case."[127] Both motions to compel alleged disclosure violations by ISN.[128]

---

[123] Tr. 221:22–222:17 (Loftus); JX 145, at 30.

[124] JX 145, at 29. This included testimony regarding supporting factors, such as high contractor growth rates. JX 145, at 29, 31.

[125] JSOF, ¶¶ 326–28.

[126] *Id.* ¶ 329; JX 153.

[127] Tr. 253:18–20, 254:7–9, 257:24–258:6 (Loftus).

[128] Neither motion to compel disclosed that the Phalon Valuation was based on materials not included with the Supplemental Documentation. *See* JX 133; JX 148. However, the first motion to compel states that "when the ISN board set the Merger consideration, it appears as if all it did was make a number of its own 'adjustments' to a valuation study that was commissioned over two years ago. . ." JX 133, at 2; *see also* JX 133, at 6 ("it appears that . . . the ISN board simply dusted off the 2011 Valuation and made a number of its own adjustments. . ."). The Motion to Compel also stated that the "2011 Valuation" (i.e. the Phalon Valuation) was not conducted consistent with Delaware law. JX 133, at 3 n.1. The second Motion to Compel made these same types of statements. *See* JX 148, at 3, 12–14.

On October 2, 2015, the parties in the Appraisal Action identified their trial witnesses.[129]  In October and early November 2015, Loftus, Brian Addy, Moye White, and Ad-Venture's counsel conducted various communications with one another centered on the Appraisal Action.[130]  Loftus held a call with Mr. Gallagher relating to an "ISN Update."[131]  The parties in the Appraisal Action identified Loftus as a trial witness, and Loftus contacted lawyers at Moye White and at Ad-Venture's counsel to discuss the implications.[132]  Ultimately, however, neither Loftus nor anyone from Gallagher testified at trial in the Appraisal Action.[133]

On January 29, 2016, Ad-Venture's counsel sent Moye White the public versions of the pre-trial briefs in the Appraisal Action.[134]  Moye White forwarded these briefs to Loftus.[135]  Counsel at Moye White testified he glanced at them, and Loftus testified that he did not read them.[136]  However, Moye White counsel billed

---

[129] JSOF, ¶ 343.

[130] *Id.* ¶¶ 343–47.

[131] *Id.* ¶ 348.

[132] Tr. 222:22–224:13, 225:11–21.  Counsel at Moye White billed 1.2 hours for each of two calls, one on October 9, 2015, and the second on November 3, 2015.  JX 192, at 2; JX 197, at 2.  The billing entry described the call as a "call with client regarding . . . strategic issues relating to lawsuit."  JX 197, at 2.

[133] JSOF, ¶ 349.

[134] *Id.* ¶¶ 362–63; JXs 199–202.

[135] JSOF, ¶ 364.

[136] Jones Dep., at 73:9–74:8; Tr. 131:16–21 (Loftus).

1.5 hours to "[r]eview pre-trial briefs as filed [in the] Delaware appraisal action."[137] On February 1, 2016, Loftus emailed the pre-trial briefs to Mike Kennedy (the broker for the original exchange transaction) and K.C. Gallagher (Gallagher's then-president).[138] That same day, Loftus scheduled a call with Moye White regarding "ISN."[139]

The Appraisal Action pre-trial briefs contained allegations such as "conflicted [ISN] board set the merger price by making 'back of the envelope' adjustments to a stale valuation commissioned years earlier," and "[t]he record now shows that none of th[e] statements [in the Halloween Letter] were true when made and were certainly not true by 2012, when provided to Polaris and Gallagher," and "the Supplemental Documentation did not contain . . . the 2011 Phalon Valuation, the adjustments that Bill Addy made to the 2011 Phalon Valuation to set the Merger Consideration, or the January 9, 2013 minutes (which presented the Board's reasons for the Merger and the Merger Consideration)."[140] As Loftus testified, several arguments and claims in the pre-trial briefs for the Appraisal Action essentially mirror Gallagher's claims in this litigation.[141]

---

[137] JX 210, at 2.

[138] JSOF, ¶¶ 365–66.

[139] *Id.* ¶ 367.

[140] JX 199, at 8, 37, 43–44.

[141] Tr. 237:2–23, 243:20–244:23 (Loftus).

Months later, in November 2016, Brian Addy scheduled a call with Loftus to "update [Loftus] on the ISN litigation."[142] They held the call on December 13, 2016.[143]

The parties in the Appraisal Action submitted vastly disparate values: ISN valued the Company at $106 million; Ad-Venture valued the Company at $645 million; Polaris valued the Company at $820 million.[144] I determined the fair value of ISN was $357 million, or $98,783 per share.[145] After this Court entered judgment on January 9, 2017, ISN appealed, and the Supreme Court of Delaware affirmed on October 30, 2017.[146] ISN paid Ad-Venture and Polaris the amount mandated by the Court in the appraisal action on December 13, 2017, and the Court entered a final order discharging the supersedeas bond on December 18, 2017.[147]

### 6. Gallagher Sues the Defendants for Breach of Fiduciary Duty

On December 15, 2017, Moye White sent Loftus copies of this Court's opinion in the Appraisal Action as well as the Supreme Court's Order affirming that opinion.[148] Loftus and Mr. Gallagher testified at trial that they first became aware

---

[142] JSOF, ¶ 369; JX 220.

[143] JSOF, ¶ 370; JX 224.

[144] JSOF, ¶ 293.

[145] *Id.* ¶ 294.

[146] *Id.* ¶¶ 296–97.

[147] *Id.* ¶ 299.

[148] *Id.* ¶ 386.

of the facts supporting Gallagher's claim in the present action when they read the opinion in the Appraisal Action and the Supreme Court's order affirming that opinion.[149] Loftus also testified that even had he read the pre-trial briefs or this Court's appraisal opinion (he testified he read neither at the time), he would not have been aware of the facts supporting the current claim because of the inconclusive nature of the parties' allegations and of trial court opinions on appeal.[150] Once the Supreme Court affirmed, Loftus testified that ISN's wrongdoing seemed "very real" and he began "paying closer attention."[151] Gallagher filed this present action on February 14, 2018, alleging that the Defendants breached their fiduciary duties by providing false and misleading disclosures regarding the Merger.[152]

*C. Procedural History*

The Plaintiff filed a Petition for Breach of Fiduciary Duty (the "Complaint") on February 14, 2018.[153] The Defendants answered on April 10, 2018.[154] The next day, the Defendants moved for summary judgment.[155] I held argument on the

---

[149] Tr. 263:2–7 (Loftus), 283:23–284:6 (Gallagher).

[150] *Id.* at 235:12–236:11, 237:24–238:22, 250:3–9 (Loftus).

[151] *Id.* at 238:7–22 (Loftus); Loftus Dep., at 204:22–205:5.

[152] JSOF, ¶¶ 1, 387.

[153] Verified Petition for Breach of Fiduciary Duty, D.I. 1.

[154] Defs.' Answer to Pl.'s Verified Compl., D.I. 9.

[155] Defs.' Mot. for Summ. J., D.I. 12.

Motion for Summary Judgment on October 5, 2018.[156] I denied the motion and ordered the parties to develop the factual record on several issues.[157] After the parties conducted additional discovery, I held a two-day trial on October 8 and 9, 2019.[158] The parties gave post-trial arguments on February 20, 2020.[159] I considered the matter fully submitted at that time.

## II. ANALYSIS

The Plaintiff brings a claim for a breach of fiduciary duty by way of disclosure infirmities against the Defendants. It attempts to isolate this claim from an unfair price and process claim to avoid application of laches. Although the Defendants strenuously deny a breach of duty in way of the disclosures, their central defense is that the Plaintiff's claim is time-barred. The situation presents a tension where equity is concerned: I am presented with Defendant fiduciaries, on the one hand, who have breached their fiduciary duties in connection with a squeeze-out of minority stockholders by a corporate controller; and on the other hand, with a Plaintiff that slept on its rights for a half-decade while red flags not only were raised but snapped crisply in the breeze. To resolve this, I examine both the claim and the

---

[156] D.I. 35.

[157] Oral Argument on Defs.' Mot. for Summ. J. and the Court's Ruling held on October 5, 2018, D.I. 37 ("October 5, 2019 Ruling").

[158] D.I. 83.

[159] D.I. 104.

defense; because it is apparent that the Plaintiff knew it had a claim when it accrued, I find for the Defendants. Gallagher had ample reason to know the Merger was unfair, but the consideration tendered met its main goal of sufficient value for the Ranch Properties it had just exchanged for its ISN shares. Gallagher accepted the consideration, then waited five years to bring its claim, until after the lengthy Appraisal Action conducted by its fellow stockholders verified the significantly higher value of its shares. It declined to pursue its rights until all risk concerning the quantum of damages had been resolved by others. As such, its claim is time-barred. Accordingly, I need not resolve the fiduciary claims. For completeness' sake, however, I briefly address the record on fiduciary duty, first.

*A. The Defendants Breached their Fiduciary Duties Regarding the Merger*

Defendants Addy and Eastin, as directors of a Delaware corporation, owed fiduciary duties of care and loyalty to the corporation and its stockholders.[160] Addy additionally owed fiduciary duties as the controlling stockholder.[161] Where, as here, a self-interested fiduciary cashes out the minority, the process employed must be entirely fair to the minority. Also included in the Defendants' fiduciary duties is the

---

[160] *See Stone ex rel. AmSouth Bancorp. v. Ritter*, 911 A.2d 362, 370 (Del. 2006).

[161] *eBay Domestic Holdings, Inc. v. Newmark*, 16 A.3d 1, 26 (Del. Ch. 2010) ("[C]ontrolling stockholders are fiduciaries of their corporations' minority stockholders." (citing *Ivanhoe Partners v. Newmont Mining Corp.*, 535 A.2d 1334, 1344 (Del. 1987))).

27

duty to disclose all material information when requesting stockholder action.[162] "Material," in this context, means "a substantial likelihood that the undisclosed information would significantly alter the total mix of information already provided."[163]    In the merger context, the company must disclose sufficient information for a stockholder to understand the value of the interest for which she is asked to accept cash or pursue appraisal.

A director's duty of disclosure, I note, acquires particular importance in a private company's cash-out merger because stockholders of such companies lack recourse to publicly-filed audited financial statements that could assist in evaluating the offer.[164]    Regardless of the situation, however, when a company asks its stockholders to choose between accepting consideration and seeking appraisal, it

---

[162] *Stroud v. Grace*, 606 A.2d 75, 84 (Del. 1992) ("[T]he term 'duty of candor' does not import a unique or special rule of disclosure.  It represents nothing more than the well-recognized proposition that directors of Delaware corporations are under a fiduciary duty to disclose fully and fairly all material information within the board's control when it seeks shareholder action."); *see also Pfeffer v. Redstone*, 965 A.2d 676, 685 (Del. 2009) ("To state a claim for breach of the fiduciary duty of disclosure on the basis of a false statement or representation, a plaintiff must identify (1) a material statement or representation in a communication contemplating stockholder action (2) that is false." (quoting *O'Reilly v. Transworld Healthcare, Inc.*, 745 A.2d 902, 920 (Del. Ch. 1999))); *Berger v. Pubco Corp.*, 976 A.2d 132, 138 (Del. 2009); *Glassman v. Unocal Expl. Corp.*, 777 A.2d 242, 248 (Del. 2001).

[163] *In re United Capital Corp., S'holders Litig.*, 2017 WL 389520, at *3 (Del. Ch. Jan. 4, 2017) (internal quotation omitted); *Skeen v. Jo-Ann Stores, Inc.*, 750 A.2d 1170, 1174 (Del. 2000).

[164] *See Wacht v. Cont'l Hosts, Ltd.*, 1986 WL 4492, at *1–2 (Del. Ch. Apr. 11, 1986); *see also Berger v. Pubco Corp.*, 2008 WL 2224107, at *3 (Del. Ch. May 30, 2008), *rev'd on other grounds*, 976 A.2d 132 (Del. 2009).

must provide all information material to the stockholders' decision to sell or seek fair value in the courts.[165]

Here, the Defendants decided to cash out some of the minority stockholders. They created a valuation for that purpose by a cursory and inaccurate update of a stale valuation. That process was not fair to the minority. Through that process, they arrived at a price that wildly understated the value of ISN. That price, obviously, was unfair.[166] In asking the stockholders to agree to that price, they made disclosures that were inadequate to the decision, as well.

The Defendants failed to disclose key documents that showed the basis for and the methods underlying their determination of the Merger Consideration based on a Company value of $138 million. In a situation such as this, where information is not readily available, and the minority stockholders must rely on management's calculations and determine whether to trust management, ISN's method of calculating the merger price becomes material.[167] Where, as here, the Defendants'

---

[165] *Berger*, 2008 WL 2224107, at *3.

[166] The cash-out price implied a corporate fair value of $138 million; I found fair value to be $357 million. Valuation is as much art as science, and I have no illusion that in fulfilling my statutory duty to determine fair value, I reached the "actual" or "intrinsic" value of ISN. Having said that, the disparity of a statutory value over two-and-a-half times the cash-out value makes it clear to me that the price was vastly low, and unfair.

[167] *See Berger*, 2008 WL 2224107, at *3 ("Where . . . a minority shareholder needs to decide only whether to accept the merger consideration or to seek appraisal, the question is partially one of trust: can the minority shareholder trust that the price offered is good enough, or does it likely undervalue the Company so significantly that appraisal is a worthwhile endeavor? . . . [W]here so little information is available about the Company, such a disclosure [about the method of

29

method of valuation was haphazard and based on admittedly stale projections, the materiality of the valuation process is heightened.[168] But the Defendants did not provide the Phalon Valuation on which they based their calculations.[169] They did not provide the adjustments that Addy made to the Phalon Valuation to arrive at a value of $138 million.[170] Nor did they provide the January 9 board minutes that gave an overview of the Merger Consideration calculation.[171] At trial, the Defendants testified that these three documents—which were undisclosed to stockholders in the Notice—provided a complete picture of how they calculated the Merger Consideration.[172] I need not decide what disclosures would be required here to comply with a duty of candor to note that the disclosures actually made were materially incomplete. Fatal to the Plaintiff's pursuit of its claims here, however, is that the breaches of duty were apparent to it when it received the Notice.

---

calculating the merger price] would significantly change the landscape with respect to the decision of whether or not to trust the price offered by the parent.").

[168] *Wacht v. Cont'l Hosts, Ltd.*, 1994 WL 525222, at *3 (Del. Ch. Sept. 16, 1994) ("[I]t appears that [defendant] simply arrived at [the merger price] rather haphazardly. . . A shareholder, in determining whether to seek appraisal or accept the terms of the Merger, would surely deem information regarding how the merger price was determined to be material.")

[169] Tr. 32:6–8, 51:10–18 (Addy), 369:7–13, 370:8–18 (Eastin).

[170] *Id.*

[171] *Id.*

[172] *Id.* at 50:2–15 (Addy).

*B. The Plaintiff was on Inquiry Notice of the Defendants' Fiduciary Breaches, Including the Disclosure Violations*

### 1. Legal Standards for Notice of Claims and Important Dates

As noted, Addy and Eastin's viable defense to their breach of fiduciary duty is that Gallagher was on notice of their malfeasance when it received the Merger Notice, and that it improperly sat on its rights. Gallagher, they note, waited five years to file suit, until after the Supreme Court affirmed this Court's Opinion in the Appraisal Action, which reduced litigation risk regarding damages to zero. In response, Gallagher contends that while it knew it had appraisal rights, and while it knew it had a breach of fiduciary duty claim for entire fairness, it could not have known that the Defendants breached their fiduciary duties by providing inadequate *disclosures*—the claim Gallagher brings here—until after it received copies from its counsel of the Supreme Court's affirmation of the Appraisal Action in December 2017.[173]

---

[173] *See* Pl. Gallagher Industries, LLC's Answering Post-Trial Br., D.I. 102 ("Pl.'s Answering Br."), at 24 ("Gallagher . . . did not know that they had been misled by the directors until December 2017, when Gallagher first saw the opinions in the Appraisal Litigation."), 26 ("The evidence at trial established that Gallagher did not know that the Notice was false and misleading until December 15, 2017, when Gallagher first learned of the decisions in the Appraisal Litigation."). Gallagher asserts that nothing in the Appraisal Action could have given it inquiry notice because it had no duty to monitor the litigation, did not monitor it, and even if it had, any facts it encountered would have remained contested and thus speculative. *Id.* at 42–52. Gallagher hedges this statement by arguing that "the earliest possible date" of inquiry notice was when its counsel received the pre-trial briefs from the Appraisal Action in January 2016. *Id.* at 26.

This Court of equity applies the legal statute of limitations absent "unusual or mitigating circumstances."[174] The statute of limitations for a breach of fiduciary duty claim is three years.[175] It begins to run when a plaintiff's claim accrues, not when the effects are felt.[176] Thus, the statute of limitations begins to run "even if the plaintiff is unaware of the cause of action or the harm."[177] The limitations period, however, may be tolled in case of one of the following: an inherently unknowable injury, fraudulent concealment, or equitable tolling.[178] The Plaintiff relies on the second two tolling rubrics here.

Fraudulent concealment requires a plaintiff to "allege an affirmative act of 'actual artifice' by the defendant that either prevented the plaintiff from gaining knowledge of material facts or led the plaintiff away from the truth."[179] Equitable tolling suspends the limitations period "while a plaintiff . . . reasonably relie[s] upon

---

[174] *Atlantis Plastics Corp. v. Sammons*, 558 A.2d 1062, 1064 (Del. Ch. 1989); *see also U.S. Cellular Inv. Co. of Allentown v. Bell Atlantic Mobile Sys., Inc.*, 677 A.2d 497, 502 (Del. 1996). The parties agree that the equitable doctrine of laches typically incorporates the statute of limitations by analogy, and that the applicable statute of limitations is the proper analysis here. *See* Pl. Gallagher Industries, LLC's Opening Post-Trial Br., D.I. 97 ("Pl.'s Opening Br."), at 35 n.106; Defs.' Opening Post-Trial Br., D.I. 96 ("Defs.' Opening Br."), at 35–36.

[175] *Smith v. Mcgee*, 2006 WL 3000363, at *3 (Del. Ch. Oct. 16, 2006); *In re Tyson Foods, Inc.*, 919 A.2d 563, 584 (Del. Ch. 2007) (citing 10 *Del. C.* § 8106).

[176] *Sunrise Ventures, LLC v. Rehoboth Canal Ventures, LLC*, 2010 WL 363845, at *6 (Del. Ch. Jan. 27, 2010), *aff'd*, 7 A.3d 485 (Del. 2010) (TABLE) (citing *In re Coca-Cola Enters., Inc.*, 2007 WL 3122370, at *5 (Del. Ch. Oct. 17, 2007)).

[177] *In re Tyson Foods,* 919 A.2d at 584 (citing *Isaacson, Stolper & Co. v. Artisan's Sav. Bank*, 330 A.2d 130, 132 (Del. 1974)).

[178] *Id.* at 584–85.

[179] *Id.* at 585 (quoting *Ewing v. Beck*, 520 A.2d 653, 667 (Del. 1987)).

the competence and good faith of a fiduciary."[180]  However, while plaintiffs "are entitled to rely on the 'competence and good faith of a fiduciary,' . . . they are not entitled to ignore red flags."[181]  Even the "trusting plaintiff still must be reasonably attentive to his interests."[182]

Where tolling occurs, it lasts until a plaintiff is put on "inquiry notice" by "facts that ought to make [it] *suspect* wrongdoing."[183]  A plaintiff need not be aware of "all of the aspects of the alleged wrongful conduct."[184]  Notice of such facts, or "red flags," requires a plaintiff to "diligently investigate and to file within the limitations period as measured from that time."[185]  Once a plaintiff is put on inquiry notice, she is deemed to be on notice of "everything to which such inquiry might have led."[186]  In *in re Primedia, Inc. Stockholders Litigation*,[187] this Court outlined a two-step analysis to determine inquiry notice: first, the plaintiff must encounter

[180] *Forman v. CentrifyHealth, Inc.*, 2019 WL 1810947, at *8 (Del. Ch. Apr. 25, 2019).

[181] *In re Primedia, Inc. S'holders Litig.*, 2013 WL 6797114, at *13 (Del. Ch. Dec. 20, 2013) (quoting *Weiss v. Swanson*, 948 A.2d 433, 451 (Del. Ch. 2008)).

[182] *Id.* (quoting *In re Dean Witter P'ship Litig.*, 1998 WL 442456, at *8 (Del. Ch. July 17, 1998), *aff'd*, 725 A.2d 441 (Del. 1999)).

[183] *Pomeranz v. Museum Partners, L.P.*, 2005 WL 217039, at *13 (Del. Ch. Jan. 24, 2005) (emphasis added).

[184] *Dean Witter*, 1998 WL 442456, at *7.

[185] *Pomeranz*, 2005 WL 217039, at *13; *In re Primedia*, 2013 WL 6797114, at *13 ("Stockholders must exercise 'reasonable diligence' when monitoring corporate filings for potential claims." (quoting *Weiss*, 948 A.2d at 452)).

[186] *Pomeranz*, 2005 WL 217039, at *13.

[187] 2013 WL 6797114 (Del. Ch. Dec. 20, 2013).

facts that reasonably should arouse suspicion; second, these facts must lead to an investigation capable of producing facts sufficient to allow the plaintiff to file a complaint capable of surviving a motion to dismiss.[188]

The salient question, therefore, is when Gallagher was put on inquiry notice that it had a breach of fiduciary duty claim against the Defendants for inadequate disclosures. Several important dates frame this analysis:

- **January 17, 2013**: Gallagher received the Notice, Supplemental Documentation, and Merger Consideration.[189]
- **September 23, 2013**: ISN served a subpoena on Gallagher in the Appraisal Action.[190]
- **October 1, 2013**: Ad-Venture and Polaris filed their first motion to compel discovery from ISN.[191]
- **February 10, 2014**: Loftus sat for a deposition as Gallagher's representative.[192]
- **March 4, 2014**: Ad-Venture and Polaris filed their second motion to compel discovery from ISN.[193]
- **April 10, 2014**: The special discovery master in the Appraisal Action filed a public report.[194]
- **January 29, 2016**: Moye White received public versions of the pre-trial briefs in the Appraisal Action and forwarded them to Loftus.[195]

---

[188] *Id.* at *13–14.

[189] JSOF, ¶ 222.

[190] *Id.* ¶ 304.

[191] *Id.* ¶¶ 326–28.

[192] Tr. 221:22–222:17 (Loftus).

[193] JSOF, ¶¶ 326–28.

[194] *Id.* ¶ 329; JX 153.

[195] JSOF, ¶¶ 362–63; JXs 199–202.

- **August 11, 2016**: This Court issued an Opinion setting the fair value at $357 million.[196]
- **October 30, 2017**: The Supreme Court affirmed the Opinion.[197]
- **December 13, 2017**: Gallagher received copies of the Supreme Court Opinion affirming the fair value of ISN.[198]
- **February 14, 2018**: Gallagher filed the Complaint in this action.[199]

Given the three-year limitation, the question is whether any event prior to February 14, 2015 put Gallagher on inquiry notice. This would include (1) Gallagher's receipt of the Notice, Merger Consideration, and Supplemental Documentation; (2) the subpoenas and Loftus's deposition in the Appraisal Action, and (3) the two motions to compel and the results from the special discovery master in the Appraisal Action.

## 2. Gallagher was on Inquiry Notice on January 17, 2013

Receipt of the Notice, Merger Consideration, and Supplemental Documentation on January 17, 2013 should have (and did) raise a "red flag" regarding disclosure violations. On that date, Gallagher knew it was working in an information vacuum. As Loftus acknowledged at trial, he did not believe the Defendants provided enough information for him to conduct a proper valuation, and he expressed concern to Mr. Gallagher regarding this lack of information.[200] He

---

[196] JSOF, ¶ 294; JX 219.

[197] JSOF, ¶¶ 296–97.

[198] *Id.* ¶ 386.

[199] *Id.* ¶¶ 1, 387.

[200] Tr. 196:8–18 (Loftus).

testified that the dearth of information was, in his experience, unprecedented.[201] Only weeks before the merger, when Gallagher had been negotiating the purchase of ISN stock, Ad-Venture had offered estimates of ISN's value in the range of $395 million to $450 million, although Loftus had expressed some skepticism, given Ad-Venture's motive to inflate the price.[202] After receiving the Notice, Loftus's own rough "ballpark" calculations provided values as high as $250 million to $350 million.[203] Nonetheless, he testified that without being provided projections or methods of valuation, Gallagher decided it was "going to trust management, at the end of the day, because management must know their business way better than we do."[204] At the same time, the disparity of values raised concerns for Loftus that the Defendants' valuation "might be low" and Gallagher might be "leaving money on the table."[205] In other words, Gallagher suspected it was being wronged, and knew it had not been provided the information to find out if this was so. That was a red flag that reasonably ought to have alerted it to the possibility that the Merger was unfair, and the disclosures were inadequate, and thus alerted it of potential entire fairness and disclosure-based claims.

---

[201] *Id.*

[202] JSOF, ¶¶ 55–56, JX 55; JX 59; Tr. 155:22–156:14 (Loftus) (noting skepticism of valuations because they were produced by or at behest of the seller).

[203] Tr. 120:3–121:8, 149:5–153:5, 198:6–199:10, 200:19–201:23 (Loftus).

[204] *Id.* at 150:5–7 (Loftus).

[205] *Id.* at 311:20–312:4 (Gallagher), 269:7–14 (Loftus).

Throughout post-trial briefing, Gallagher makes a "hoist Defendants on their own petard" argument with a certain equitable appeal. Gallagher notes that the Defendants maintain that the Notice was proper, and that Addy testified that it was neither misleading nor deficient.[206] Consequently, Gallagher argues, from Addy's own mouth came the proof that the Notice did not *appear* deficient, and Gallagher could have had no way to know it had a potential claim for a disclosure violation.[207] The problem with this argument is that, for the reasons detailed above, there was in fact sufficient reason for Gallagher to be aware of a claim.

I have found that Gallagher was alerted by the Notice to potential disclosure inadequacies. Gallagher had an obligation to diligently investigate and was on notice of everything to which such an investigation would have led.[208] Had Gallagher investigated, it would not have run into a dead end. On January 17, 2013, it knew that it was being cashed out in a controlled transaction without any procedural safeguards. Because of this, it certainly could have filed an entire fairness claim that would survive a motion to dismiss. Discovery in such a claim would have made concrete the apparent disclosure violations, just as discovery in the Appraisal Action demonstrated those same violations. In sum, because of the red flag present

---

[206] *See, e.g.*, Pl.'s Answering Br., at 23, 25.

[207] *See id.*

[208] *Pomeranz v. Museum Partners, L.P.*, 2005 WL 217039, at *13 (Del. Ch. Jan. 24, 2005); *In re Primedia, Inc. S'holders Litig.*, 2013 WL 6797114, at *13 (Del. Ch. Dec. 20, 2013).

on January 17, 2013 regarding possible disclosure violations, I find that Gallagher was on inquiry notice as of that date.[209]

Having received the Merger Consideration it knew might be unfair, but frustrated by an inability to verify whether it was unfair because of insufficient information, Gallagher should have been aware of the potential for price/process and disclosure claims. No tolling of the limitation period applies.

### 3. Gallagher had Additional Reason to Inquire and Pursue its Claims Prior to April 10, 2014

Other ISN stockholders pursued a timely appraisal claim. I note that the progress of this Appraisal Action provided Gallagher with further inquiry notice. Gallagher states that would-be plaintiffs do not have a duty to monitor litigation and scour court filings looking for claims, but that is true only "absent any reason to

---

[209] Gallagher does not deny that it was aware of a potential claim that the merger was unfair at the time it received ISN's Notice; its contention is that it was unaware of a potential *disclosure* claim. *See* Pl.'s Answering Br., at 1–2. Where a squeezed-out stockholder in a controller transaction has evidence that the transaction is unfair in regard to price, and it cannot reconcile that evidence with disclosed information from the company seeking its acceptance of the deal price, it is on notice of a disclosure violation. I find Gallagher's argument—that it had notice of an entire fairness claim, but not a disclosure claim—an artificial and immaterial distinction on these facts. I note that, even if there had been no suspicious facts regarding inadequate disclosures (which I find there were), Gallagher would still presumably have been on inquiry notice because it was on notice of the price and process claim, which on these facts is all that the inadequate disclosures are alleged to have masked. Our case law does not require, as Gallagher argues, that the red flag relate *precisely* to the claim ultimately litigated, if the claim arose from the incident serving as the red flag. *See In re Tyson Foods, Inc.* 919 A.2d 563, 593–94 (Del. Ch. 2007) (finding plaintiff on inquiry notice of breach of fiduciary duty claim regarding related-party transactions but not for fiduciary duty claim based on other *discrete* related-party transactions). If a plaintiff has "facts that ought to make [it] suspect wrongdoing," then the plaintiff is on notice of "everything to which such inquiry might have led." *Pomeranz*, 2005 WL217039, at *13.

think [it has] been injured."[210] Here, Gallagher suspected it might be leaving a great deal of money on the table—perhaps as much as half what it was owed. The only two other outside shareholders—faced with the same facts—sought appraisal.

This is not a situation where Gallagher would have to scour court filings trying to flush out information about speculative wrongdoing. If it wanted to investigate the injury it already suspected, it knew exactly where to look and exactly who to ask for that information. In fact, it hardly needed to investigate at all: Gallagher itself was subpoenaed, produced documents, sat for a deposition, and discussed the case with counsel. When the injury it already suspected was so closely intertwined with the ongoing litigation, and where Gallagher itself was thrust into discovery in that litigation, monitoring the litigation, I find, falls under its obligation to "diligently investigate."[211] Having looked at ISN's financials, considered the possibility that the Merger Consideration was severely undervalued, and speculated about what the Defendants knew that they were not telling Gallagher, one would imagine the Appraisal Action would be the *first* place a diligent investigation would lead. Even casual attention to the public filings would have revealed further red flags to notify Gallagher of the facts underlying this litigation.

---

[210] *Carsanaro v. Bloodhound Techs., Inc.*, 65 A.3d 618, 646 (Del. Ch. 2013).

[211] *In re Primedia*, 2013 WL 6797114, at *13.

Because Gallagher was on notice of a potential breach of fiduciary duty claim, it cannot rely upon the fraudulent concealment rubric to toll the limitations period. Neither can the concept of equitable tolling aid Gallagher here. Equitable tolling halts the running of the limitations period "while a plaintiff has reasonably relied upon the competence and good faith of a fiduciary."[212] This the Plaintiff argues that it did, testifying that it decided "to trust management, at the end of the day, because management must know their business way better than we do."[213] Such trust, however, does not entitle plaintiffs "to ignore red flags."[214] Here, the Plaintiff was squeezed out at what it had ample reason to believe was an unfair price, without disclosure of the means to understand how the Defendants set that price. Even the "trusting plaintiff still must be reasonably attentive to his interests."[215] Gallagher leans entirely on the first principle of equitable tolling—trusting the good faith of fiduciaries—and ignores the second, reasonable reliance. Given the red flags that ought to have made it suspicious at several different dates and in several different ways that the disclosures it received from the Defendants were inadequate and misleading, I find it was not entitled to this reliance and was not "reasonably

---

[212] *Forman v. CentrifyHealth, Inc.*, 2019 WL 1810947, at *8 (Del. Ch. Apr. 25, 2019).

[213] Tr. 150:5–7 (Loftus).

[214] *In re Primedia*, 2013 WL 6797114, at *13 (quoting *Weiss v. Swanson*, 948 A.2d 433, 451 (Del. Ch. 2008)).

[215] *Id.* (quoting *In re Dean Witter P'ship Litig.*, 1998 WL 442456, at *8 (Del. Ch. July 17, 1998)).

attentive to [its] interests."[216]  Had it investigated based on the red flags, it would have timely discovered the facts that underlie a complaint made five years after its injury accrued.

That it did not bolsters my belief that Gallagher was well aware of the existence of its claim from the time it received the Merger Notice.  What changed in the intervening five years was not its understanding of the claim, but the attractiveness of the litigation given the result of the Appraisal Action.  Gallagher's claim is barred by laches.

### III. CONCLUSION

The Plaintiff's claim for breach of fiduciary duty is dismissed as time-barred. An appropriate Order is attached.

---

[216] *Id.*

**IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE**

GALLAGHER INDUSTRIES, LLC,   )
                            )
          Plaintiff,        )
                            )
     v.                 )  C.A. No. 2018-0106-SG
                            )
WILLIAM M. ADDY and JOSEPH E.  )
EASTIN,                      )
                            )
         Defendants.    )

## ORDER

AND NOW, this 29th day of May, 2020, for the reasons set forth contemporaneously in the attached Memorandum Opinion dated May 29, 2020, the Plaintiff's claims against Defendants for breach of fiduciary duty and aiding and abetting the breach of fiduciary duty are hereby DISMISSED.

IT IS SO ORDERED.

                              /s/ Sam Glasscock III

                              Vice Chancellor